## WAMPLER v BOLEN

Ohio Appeals, 2nd Dist, Darke Co

No 534.   Decided June 14, 1938

S. E. Mote, Greenville, for plaintiff.
T. A. Billingsley, Greenville, for executor, defendant.

Walter Rhynard, Greenville, amicus curiae for Joseph Wampler.

## OPINION

By BARNES, PJ.

The above entitled cause is now being determined as an error proceeding by reason of plaintiff's appeal on questions of law from the judgment of the Court of Common Pleas of Darke County, Ohio.

The issues between the parties are presented through plaintiff's petition, defendant's second amended answer and plaintiff's reply.

The cause was submitted to the trial court and a jury, the court finally withdrawing the evidence from the jury's consideration and making a ·finding in favor of plaintiff in the sum of $60.00 on defendant's proffer, in open court, to permit a recovery in that amount.

The issues between the parties are within very narrow bounds and rather than quote from the pleadings at length, we state the issues in our own language.

The plaintiff, Robert C. Wampler, was the son of Rachel Wampler, the latter having departed this life on the 31st day of July, 1936, at an advanced age, leaving surviving her, three sons, her only heirs and next of kin. She left property of the inventory value of approximately $5,000.00. Prior to her death, her home was on a 19 acre farm near Union City. The plaintiff was unmarried and was a part of his mother's household for many years prior to her death. During the last few years of Mrs. Wampler's life, she had more or less sickness, on one occasion suffering a broken hip. Thereafter, pending her recovery, she moved around in a wheel chair and at times, required considerable attention. The plaintiff, Robert C. Wampler, gave to his mother much of his time in attending to her personal wants in addition to farming her small tract together with other contiguous farm land, which he rented from neighbors. The evidence presented supported his claim that during the lifetime of his mother he, at all times, gave her assistance in her household duties and during her later years, did the greater portion of the housework. This included doing the family washing, cooking, assisting his mother in her bath and other work ordinarily done by a woman in the care of a home.

Following the death of Mrs. Wampler, the plaintiff, Robert C. Wampler, presented

to her executor a claim for services set out as follows:

From January 1, 1922 to January, 1928, 312 weeks at $2 ............ $ 624.00
From January 1, 1928 to January 1, 1930, 104 weeks at $3 .......... 312.00
From January 1, 1930 to April 24, 1935, 286 weeks at $4 ........... 1144.00
From April 24, 1935 to July 12, 1936, 64 weeks at $10 ............. 640.00

Total amount due ......... $2720.00

The executor rejected the account and within statutory time, plaintiff filed his action.

The petition, among other things, alleged that plaintiff rendered the services to his mother, Rachel Wampler, under an express agreement that plaintiff should be paid the reasonable value of such services out of her estate at her death and that the services were reasonably worth the amount detailed.

The defendant, executor, in his second amended answer as a first defense, admitted the allegations of the petition as to defendant's appointment and qualification as executor of the estate of Rachel Wampler. The answer further admitted the presentation and rejection of the claim and thereafter denied each and every other allegation contained in the petition.

The second defense, among other things, averred that plaintiff was a son of the decedent; that during the period of time covered by the bill for services, he resided with his mother in a home owned by her; that the decedent, Rachel Wampler, left a will, the contents of which was known to the plaintiff; that the will was duly probated and no action brought to contest the will and that the will contained provisions directing her executor to refuse payment of any accounts from any of her sons for care during her last illness, etc. The second defense also contained the averments, that under the terms of the will the plaintiff, Robert C. Wampler, was named as one of the beneficiaries and under the provisions of the will would receive one-half of the distributive portion of said estate. Further, that said Robert C. Wampler had accepted the provisions of said will.

It is further averred that by reason of the facts stated in the second defense, Robert Wampler should be estopped from prosecuting the action.

Plaintiff's reply traverses certain allegations of the answer and thereafter contains a general denial of all such matters as are not admitted in the petition.

The will of the decedent was presented in evidence and reads as follows:

"WILL

"I, Rachel Wampler, of Jackson Township, Darke County, Ohio, do hereby make, publish, and declare, this to be my last will and testament.

"I order and direct, that my executor hereinafter named pay all my just debts and funeral expenses as soon after my decease as conveniently may be, and I request that he purchase a lot in the Greenville cemetery, and expend only a reasonable sum for funeral expenses and a marker.

"After the payment of such funeral expenses and debts, I give, devise and bequeath unto my son Arthur Wampler, the sum of one dollar, ($1.00), he having received his share of my estate, by reason of debts I have paid for him in the purchase of threshing machines, and having mortgaged my farm for the payment of debts secured to him.

"After the payment of this bequest, I give, devise and requeath all the residue of my estate, both real and personal, wherever situated, to my two sons, Joseph Wampler, and Robert Wampler, share and share alike.

"And I further request that my executor, hereinafter named, refuse the payment of any accounts from any of my sons, for care during my last sickness, as payment has been made, and will be made, during my life, of all such claims and debts.

"I make, constitute and appoint R. A. Bolen to be executor of this, my last will and testament, hereby revoking all former wills by me made.

"In witness whereof, I have hereunto subscribed my name this 1st day of June, A.D., 1936.

"(Signed) Rachel Wampler."

Then follows the signatures of the witnesses.

During the trial, at the close of plaintiff's testimony, there was dictated into the record and presented to the trial court the following motion:

"At this time we demur to the evidence and move for an instructed verdict for the reason that there is no clear and convincing evidence of an express contract existing between the mother and son; for the further reason that the will now offered by the plaintiff is a defense, at least, to all items prior to June 1, 1936."

The trial court overruled the motion for directed verdict with the following comment:

"The motion for a directed verdict is overruled on the first ground that there is no express contract shown as the law requires, the court believing that this is a matter that should go to the jury under proper instructions.

"The motion to eliminate all of the items prior to June first is at this time overruled because in order to make the will a bar there must be shown an acceptance of the terms of the will on the part of Robert Wampler, and there is no such evidence as yet before the court of his acceptance. The waiver and the consent of the will to be filed would not amount to an acceptance of its terms; something further, it seems to the court, would be required. So that motion is overruled on both grounds."

Following this ruling and comment of the court, the defendant called Harry Miles, Probate Judge of Darke County, Ohio, and had identified the will of the decedent, together with the proceedings supporting its probate, and then offered the will in evidence as defendant's exhibit "2". In the cross-examination of Judge Miles, when called as a witness for the plaintiff, counsel for defendant drew from the witness testimony that no certification had been made to him that the will was being contested in any court.

As a second witness, defendant called Dan W. Shephard, Clerk of Courts of Darke County, Ohio, and from this witness elicited testimony disclosing that Joseph Wampler, one of the legatees under the will of his mother, had filed in the Common Pleas Court of Darke County, Ohio, an action seeking to partition the 19 acre tract of land heretofore referred to, in which the plaintiff, Robert, was made a party defendant, duly served with summons and filed answer.

The answer of Robert denied an allegation of the petition that the personal property of the estate of Rachel Wampler, deceased, was sufficient to pay the debts of said estate and further in the answer specifically set forth that the land was encumbered by a mortgage and that the debts of said estate were greater than the assets.

The purpose of this testimony was intended to support the second defense of defendant's answer in the instant case, wherein it was contended that the plaintiff, Robert, had elected to take under the will of his mother and thereby was prevented from bringing his action on his account for services.

After the introduction of this evidence the defendant renewed the motion and asked the court to strike from the record all evidence pertaining to services rendered on and prior to the day of June 1, 1936, being the date of the will which was introduced. Following the making of the motion, counsel for defendant withdrew same temporarily and called Robert Wampler, the plaintiff, for cross-examination. The cross-examination was limited to matters occurring following the death of Mrs. Wampler. Specific inquiry was made of the plaintiff as to whether or not he was going to accept the 50% share of the estate from the executor when distribution would be made. Plaintiff answered that he would rely on advice of counsel and declined to answer "Yes" or "No".

Counsel for defendant renewed his motion to strike from the record all reference to services rendered on and prior to June 1, 1936. The court sustained the motion with the comment that all items of charge prior to the execution of the will, June 1, 1936, would be eliminated. Thereupon counsel for the defendant, executor, made an offer in open court to confess judgment for so much of the amount of the claim set out in the petition as purported to be a charge following the first day of June, 1936 and to July 12th, being six weeks at $10.00 per week. In other words, sought to confess judgment for $60.00 plus costs. Thereupon the court made his finding that judgment might be entered for that amount and the jury was discharged.

In due time, motion for new trial was duly filed. Also request was made in writing for reassignment of the case and submisssion to a jury.

We are now called upon to determine whether or not manifest error appears of such prejudicial character as to require a new trial.

We are unable to follow the reasoning of the court in supporting his order and judgment, but have no difficulty in arriving at the conclusion that the judgment will not be disturbed on other grounds.

It is proper that we give our reasons for our conclusions. Counsel for the executor, through his brief, cites the following authorities in support of the trial court's judgment.

**Vol. 41 O. Jur., p. 897.**

**Younce et v Flory, 77 Oh St 71.**

**Painter v Painter et, 18 O. 249.**

Farmer v Cope, 55 Oh St 695.

Patterson, Exr. v Atkinson, Exr., 7 Oh Ap 495.

Bender v Bateman, 33 Oh Ap 70.

We have no difficulty in following the principles announced in the cited cases, but we are unable to conclude that they have application to the instant case. A testator has a perfect right to attach conditions to each and every bequest she makes when rules of public policy or rights of alienation are not involved. The legatee, if he accepts the bequest, takes it subject to all conditions imposed under the will. Where a testator desires to protect her estate against the presentation of claims by named legatees, the usual method is to write in the will that should any of the named legatees present claims against the estate, they should be barred from participating in the distributive share otherwise coming to them under the will. Another method is to make provision that the bequest and legacies made are in complete and full settlement and payment of any and all claims that the devisees or legatees might have or present against the estate. Cases cited, including citation from Ohio Jurisprudence, are in line with the above principles of law. In the instant case, the testatrix failed to make any such provision. The language used may not be given such a construction. Let us examine this clause of the will:

"And I further request that my executor hereinafter named, refuse the payment of any accounts from any of my sons, for care during my last sickness, as payment has been made, and will be made, during my life, of all such claims and debts."

This is nothing more than a self-serving declaration and, in law, cannot have the effect of extinguishing a bona fide claim.

The language used may not be given a construction as providing a condition under which the bequest may be accepted. It is entirely separate.

The clause does very positively and directly instruct the executor to reject any and all claims presented by any of her sons for care during her last illness and then gives her reasons for making this positive request, that all such claims have either been paid or will be paid during her lifetime. All these provisions are very general, no specific reference being made to her sons separately, but on the other hand, collectively, nor is any amount or time mentioned other than during her last illness. She says that all claims have been paid or will be paid without indicating the ones to which payments have been made or when the payments to others will be made. Of course, the statement as to payments that have been made is a recital of a past event, but the declaration that certain payments will be made is something which she may or may not have complied with. This analysis is only made for the purpose of disclosing how unjust it might be to accept the theory of counsel for executor. But regardless of this possible unjustness, it is our determination that the language may not be made to attach so as to confine legatees to the presentation of a death claim as a condition precedent to accepting the bequest of the will.

Even if the language quoted by the will, or any language, however strong, would attach as a condition precedent to the acceptance of the bequest under the will, it is still a fact that it would be improper for the court, under the facts as disclosed in the instant case, to determine that a legatee had elected to accept provisions in the will and therefore could not prosecute an action on claim for services. It is our position that the reverse would be a correct statement of the law. In other words, the bringing and prosecuting of his action on his claim for services is an election to proceed on his claim and in a proper case would be the authority under which the executor would follow the inhibitions in the will in making his distribution. In other words, if a testator in his will should declare in proper language that if any of the legatees named in the will should present and prosecute a claim against the estate, such action on the part of the legatee would bar him or her from any share otherwise provided in the will. The legatee might elect to prosecute his action and thereafter the executor would follow the directions of the will and decline to make distribution to such offending legatee. Of course, we have no power in this case to determine what the executor of Mrs. Wampler shall do when it comes to making distribution, but we do volunteer the statement, that at this time, we are not inclined to think that he would have any such right. Of course, in a proper case the acceptance of a legacy by a legatee would estop such legatee from prosecuting

an action on a claim, which, under the express language of the will, is cancelled or barred in the provisions of the will. No distribution has been made in the instant case.

The case of **Whigman v Banan, 21 Oh Ap 496** is in point and at page 504 of the opinion we find the following:

"The admission of the will and codicil in evidence for the purpose of defeating recovery or diminishing the verdict was improper."

This case should be read in its entirety. We also make reference to the case of **Fell, Admr. v Carter, Admr., 26 O.C.C. 511.**

We now consider the question as to whether or not the trial court was in error in his failure to direct a verdict on the stated ground that plaintiff had failed to prove by clear and convincing evidence the existence of an express contract between decedent and her son, the plaintiff. Counsel for the executor in his brief, does not argue this question, possibly because of the fact that the decision of the court on this question was against him and the executor was not prosecuting error. Should this be the reason, it is not well grounded. It is the duty of a reviewing court to search the record to ascertain whether or not the judgment is sound and, if so, we should give an affirmance, even though our reasons may differ from those advanced by the trial court. On this question the record is made and the question is properly before us.

Joseph Wampler, an interested and affected legatee, through his counsel files a brief amicus curiae and in this latter brief, this question is discussed at length.

Counsel for plaintiff · on page 4 of his brief, under the heading "Evidence" refers to the witnesses and the pages of the record wherein will be found the testimony as to an express contract. The first reference is to witness Frank Austerman, pages 10 and 11 of the record. The particular evidence referred to on these pages makes no reference at all relative to contract for services or their payment. At this particular point in the record, it only refers to certain services that the witness observed the plaintiff perform.

The next witness referred to is Minnie Crowel, pages 24 and 25 of the record. We quote this evidence in full:

"Q. Did you ever talk to or hear Mrs. Wampler say anything in the presence of Robert about payments?

A. Well, I said, I think you have a very fine young man here. I said, I think he ought to be doubly paid for what he has done here.

Q. As I understand, is that what you said or she said?

A. I said that to mother; she said that he will be well paid.

Q. She,—now, Robert was there was he?

A. Yes.

Q. What were you doing, lifting her?

A. We were lifting her. We were waiting on her, giving her this injection.

Q. All right, did you ever hear her make any remarks about payment more than once?

A. What payment?

Q. Just about taking care of Robert; paying Robert?

A. No, I don't remember that.

Q. Did you ever hear her say anything about these,—the nature of his services?

A. Well, she said,—I said, he ought to be well paid. Well, she says, he will be well paid.

Q. Did she ever say anything about whether he was taking good care of her?

A. Yes.

Q. Did she ever say anything with reference to what kind of care he was giving her?

A. Yes.

Q. What did she say?

A. She said that Robert is giving me just the very best of care; the best that he could."

The next witness referred to is John Meeks at page 37 of the record:

"Q. Now, did you ever have a talk with her in regard to Robert?

A. Well, now, yes, I have talked with her. My mail box used to set right beside of Mrs. Wampler's. I would go down to get my mail. You know I couldn't get around very good. I would set down on the porch and rest. I would talk with her and she told me a couple of times that she expected Robert to be well paid for what he had done for her; saiyed with her and attended to her.

Q. Now, did you ever,—did you ever talk to her when Robert was present about the place, what she was going to do with the nineteen acre place?

A. Well, she did say there at that time that she either wanted Robert,—either have the place or be well paid for what he done for her when he was there.

Q. Do you remember any particular time when Robert was there or come in while you were talking?

A. I don't just remember about that.

Q. I say, do you remember of Robert being there at the time that she made any statement of that kind?

A. I believe he was there once. I think he was there once."

The next witness was Art Wampler, page 86 of the record:

"Q. What did she say to him about it?

A. Well, I guess that was just a matter of family talk, and she just simply sorta told it in her own way, but I had heard her say different times,—I couldn't give any date for it or any specific time, but I have heard her say at different times that Robert would have to be paid for helping take care of her.

Q. Now, did you ever hear her say that when Robert was present?

A. I might have.

Q. At the table or,—

A. More usually when we were in the room of an evening.

Q. Do you remember of any time when he was present that she made any remark of that kind?

A. Yes, I have when we were in the room."

The next witness was William Phillips, pages 109 and 110 of the record:

"Q. And did you have any conversation there with Mrs. Wampler?

A. I did.

Q. In the hearing of Robert in regard to Robert's services?

A. Yes, I did.

Q. I wish you would tell the jury what was said there?

A. Well, she said to me she didn't see how she could get along without him and he should be paid for his work.

Q. Where was it at?

A. Out there west of,—north of Union at the home.

Q. Was it at the supper table, was it?

A. Yes, at the supper table. I stayed all night. Robert washed the dishes and run in every little bit while I was there to look after his mother."

At page 110, same witness, cross examination:

"Q. Did she tell you whether she was paying Robert or not?

A. No, sir, she said he should be paid.

Q. Didn't say anything about whether she was paying him along?

A. No, sir.

Q. Nor how much she was,—didn't say anything about how much she paid him?

A. She didn't say anything. She said he should be paid.

Q. What did Robert say?

A. He didn't say anything.

Q. How did she come to make that remark; what lead up to it?

A. I asked her how much Robert was getting, she said,—

Q. Getting for what?

A. For his work there, and she said I want Robert to be paid for his waiting on me.

Q. You knew that Robert had always lived with his mother, didn't you?

A. Yes."

Next witness, John Kuhlman, page 116 of the record:

"Q. Did you ever hear her say anything with reference to compensating Robert? Mrs. Wampler, did you ever hear say anything about compensating Robert.

A. You mean in the way of getting money, getting repaid for what work he done?

Q. Yes.

A. One time.

Q. What did she say about?

A. She said she was causing Bob to be held up late on his field work but that he would be repaid later on.

Q. Do you know about how long that was before she died?

A. Oh, that was probably two or three years, as near as I can tell.

Q. Was Bob there at the time that she said that; did he hear that?

A. He was in the next room.

Q. You don't know whether he heard that?

A. I couldn't say."

There can be no question that under the record an implied contract is shown but under the cited cases, recovery may not be had on an implied contract. The rule of law in this state and in many other jurisdictions unqualifiedly holds that where the family relation exists as in the instant case, a son may not recover from the estate of his deceased parent unless he establishes by clear and convincing evidence an express contract between the parent and the child.

It is our conclusion, after an examination of the entire record that there is an

absolute failure of proof on the part of plaintiff to present any evidence of an express contract.

This is not a new question to us. In the case of **Flax v Williams**, Fayette County, Ohio, decided December 7, 1937 and reported in **25 Abs page 680**, we reviewed all the Ohio cases and therein announced the requisite elements to constitute an express contract. In the Fayette County case we sustained the judgment for plaintiff, but in so doing, we necessarily held that there was evidence supporting an express contract and that the same was shown by clear and convincing evidence. In view of the fact that this opinion will be available to counsel, we do not think it necessary that we again go into an extended discussion of the character of proof necessary to show an express contract. The following cases were examined and referred to in the Fayette County case and we again cite these cases in the instant case:

**Hinkle v Sage, 67 Oh St 256.**
**Merick v Ditzler, 91 Oh St 256.**
Jones Commentaries on Evidence. Second Edition, Vol. 1, p. 16.
**Lemunyon v Newcomb, 120 Oh St 55.**
**Wood v Trust Co., 55 Oh Ap 303.**
**Arns v Disser, 40 Oh Ap 163.**
**Scheetz, Admr. v Scheetz, 47 Oh Ap 37.**

In many of the above cases the facts in favor of the claimant were much stronger than in the instant case, yet in all instances, except the Fayette County case, defendant's right to recover was denied on the ground that the evidence failed to prove, by the requisite degree of proof, the existence of an express contract.

The next question confronting us is as to what shall be the order of this court in view of the fact that defendant consented to an entry of judgment in the sum of $60.00 and the court so decreed.

While it is true that under our conclusions the plaintiff would not be entitled to recover anything, yet the fact that he was awarded judgment for $60.00 would not constitute prejudicial error. In other words, error may not be predicated upon plaintiff's receiving something that he was not entitled to.

It is our conclusion that the record presents no manifest error and therefore the judgment of the trial court will be affirmed and costs taxed against plaintiff.

HORNBECK and GEIGER, JJ, concur.